UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| In re ANALOGIC CORP. SHAREHOLDER LITIGATION | * * * * * * * * | Civil Action No. 18-cv-11301-ADB |

## <u>MEMORANDUM AND ORDER ON MOTION TO DISMISS</u>

BURROUGHS, D.J.

Lead Plaintiff Louis Buttny ("Buttny") brings this shareholder class action on behalf of the former shareholders of Analogic Corporation ("Analogic" or the "Company") against the Company and several members of its board of directors (the "Board," as parties the "Individual Defendants," and together with Analogic, "Defendants")[1] for violating federal securities laws in connection with the sale of the Company to Altaris Capital Partners, LLC ("Altaris"). Defendants arranged the sale to Altaris for $84.00 per share and succeeded in obtaining stockholders' approval. [ECF No. 45 ("Amended Complaint" or "Am. Compl.") ¶ 12]. The sale price was well below Analogic's stock closing price of $96.05 just hours before the merger was announced. [Id.]. Buttny claims that Defendants violated Section 14(a) of the Securities Exchange Act of 1934 ("Section 14(a)"), 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder ("Count I"), see [Am. Compl. ¶¶ 101–07], and that the Individual Defendants also violated Section 20(a), 15 U.S.C. § 78t(a), ("Count II") by including materially false and misleading statements in the proxy that

---

[1] The Individual Defendants are Chairman of the Board Bernard C. Bailey, Directors Dr. Jeffrey P. Black ("Black"), James J. Judge, Michael T. Modic ("Modic"), Stephen A. Odland ("Odland"), Joseph E. Whitters ("Whitters"), and President and Chief Executive Officer Fred Parks ("Parks"). [Am. Compl. ¶¶ 22–28].

was disseminated to shareholders to secure their approval of the sale, [Am. Compl. ¶¶ 108–12]. Presently before the Court are the Individual Defendants' and Analogic's respective motions to dismiss.  [ECF Nos. 46, 49].  For the reasons discussed below, the motions to dismiss are GRANTED and the Amended Complaint is dismissed with prejudice.

## I.      BACKGROUND

The following facts are drawn from the Amended Complaint, the well-pleaded allegations of which are taken as true for the purposes of evaluating the motion to dismiss.  See Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014) (citing A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013)).  Certain details are also culled from documents attached to the Amended Complaint and from documents whose authenticity is not disputed by the parties.  See Álvarez-Maurás v. Banco Popular of P.R., 919 F.3d 617, 622 (1st Cir. 2019) (citing Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).

Before the sale at issue here, Analogic was a publicly traded company that designed, manufactured, and sold medical and security technology components to healthcare and industrial customers.  [Am. Compl. ¶ 40].  It operated three segments: (i) medical imaging, which included computer tomography, magnetic resonance imaging, and digital mammography; (ii) ultrasound; and (iii) security and detection, which sold medical technology for use in automated baggage inspections.  [Id.].

On June 6, 2017, the company reported revenue declines in its medical imaging and ultrasound segments for its third quarter, which were at least partially offset by revenue growth in its comparatively smaller security and detection segment.  [Id. ¶ 41].  Management assured stockholders that these declines were temporary and that the Company's Board-approved financial

operating plan (the "Operating Plan") suggested Analogic would experience a turnaround in 2018 and would be able to return long-term value to its shareholders.  [Id.].

An activist shareholder, Voce Capital Management, LLC ("Voce"), used the disappointing revenue numbers as an opportunity to begin pushing for a near-term sale of the Company.  [Id. ¶¶ 4, 42].  On June 26, 2017, Analogic CEO Fred Parks agreed to meet with Voce, and Analogic subsequently terminated its CFO and retained Citigroup Global Markets, Inc. ("Citi") as its financial advisor.  [Id. ¶¶ 43–45].  On August 30, 2017, Voce announced its intention to nominate four candidates to replace Board members at Analogic's 2017 shareholder meeting.  [Id. ¶ 47].  In September 2017, Analogic held discussions with Voce and announced that it had initiated a process for the sale of the entire Company to maximize shareholder value on an accelerated timeline.  [Id. ¶¶ 48–52].  On October 12, 2017, Analogic and Voce entered a cooperation agreement under which Analogic agreed to add Voce's nominee Joseph Whitters as a new Board member and to form a strategic alternatives committee consisting of Defendants Whitters, Bernard Bailey, and Jeffrey Black (the "Committee") to explore a sale.  [Id. ¶ 53].  In exchange, Voce agreed to withdraw its notice of intent to nominate new board candidates and agreed not to disparage the Board or Analogic's management.  [Id. ¶ 54].

According to the proxy, during the sale process, Analogic was in contact with 75 potential strategic and financial buyers, 38 of whom entered into non-disclosure agreements and received confidential information concerning the Company.  [ECF No. 48-1 at 44].  From November 15 to November 17, 2017, Analogic received several proposals from entities interested in acquiring a part or all of the Company, [Am. Compl. ¶ 55], including Altaris, who submitted a preliminary, non-binding indication of interest in acquiring the Company for a price of $80.00 per share.  [ECF No. 48-1 at 45].  During December 2018, Analogic evaluated the bids and discussed the need to

perform reverse due diligence on the companies that had proposed purchasing Analogic for a combination of stock and cash. [Id. at 47].

In January 2018, Analogic began experiencing the turnaround that management had predicted. [Am. Compl. ¶ 57]. Management informed the Board that the Company's financial projections needed to be revised upward to account for the improved performance and outlook. [Id. ¶ 58]. On January 15, 2018, the Committee approved a revision to the Operating Plan to reflect the improved performance and the anticipated effects of tax reform legislation that had been passed in December 2017 (the "Revised Operating Plan"). [Id. ¶ 59]. The Revised Operating Plan reflected expectations of compound annual growth of 10 percent in the ultrasound segment as compared to the 6 percent projected by the original Operating Plan. [Id.]. On January 17, 2018, the Revised Operating Plan was provided to companies that the Board considered viable bidders in the sales process, including Altaris. [Id. ¶ 60; ECF No. 48-1 at 47.] Between January 29 and 31, 2018, three companies submitted a second round of bids to acquire Analogic for between $80.00 and $85.00 per share. [Am. Compl. ¶ 61]. Altaris was the sole bidder to submit an all-cash offer and proposed acquiring Analogic for $82.50 per share. See [ECF No. 48-1 at 48].

On February 1, 2018, management informed the Board that Analogic would need to revise its financial projections upward once again. [Am. Compl. ¶ 62]. On February 8, 2018, management prepared an updated financial forecast for 2018 that reflected increasing confidence in the ultrasound segment and expected revenue growth in the security and detection segment. [Id. ¶ 63]. The updated projections were provided to the Board, Citi, and the three remaining viable bidders. [Id. ¶ 64].

Management incorporated the updated projections into an updated Revised Operating Plan and extrapolated to provide projections through fiscal year 2022. [Id. ¶ 65]. The five-year

extrapolations assumed a decline in revenue growth to 3 percent in 2021 and 2022 from the 11 percent projected in 2020 (the "Case 1 Projections").  [Id. ¶ 65].  Citi performed a discounted cash flow ("DCF") analysis using the Case 1 Projections and found an implied equity value per share of $84.40 to $108.20.  [Id.].

On February 26 and 27, 2018, the three remaining companies in the bidding process submitted a third round of bids.  [Id. ¶ 67].  The bids were valued at $80.00, $82.50, and $85.00 per share, with Altaris bidding $82.50 per share in cash.  [Id.; ECF No. 48-1 at 50].[2]  The $85.00 bid was composed of both stock and cash components, and its valuation was therefore subject to fluctuation based on the value of the acquiring company's stock.  [ECF No. 48-1 at 50].  According to the proxy, the value of the purported $85.00 bid had declined to approximately $80.60 based on the acquiring company's closing price as of the date of the bid letter.  [Id.].

On February 28, 2018, the Board held a meeting where Citi presented its DCF analysis.  [Am. Compl. ¶ 68].  In addition to the analysis that Citi had prepared based on the Case 1 Projections, Citi presented a DCF analysis using projections that were compiled by removing the value expected by management from a channel development initiative for Analogic's medical computer tomography (the "CT Initiative") (the "Case 2A Projections").  [Id. ¶ 69].  At that time, two bidders had questioned the value of the Company's CT Initiative during meetings with management that occurred in conjunction with the bidding process.  [ECF No. 48-1 at 50–51].  The DCF analysis based on the Case 2A Projections yielded an implied value of $81.25 to $103.65 per share.  [Am. Compl. ¶ 69].

---

[2] The Altaris offer was to be reduced by any dividends the Company paid after December 31, 2017.  [ECF No. 48-1 at 50].

After being asked to consider increasing its bid, Altaris submitted a revised proposal to acquire Analogic for $84.00 in cash on March 4, 2018.  [Id. ¶ 70; ECF No. 48-1 at 51].  At a March 8, 2018 meeting, the Board determined that Altaris's offer was the only viable bid for Analogic.  [Am. Compl. ¶ 72].  That bid remained below the $84.40 low end of the value range implied by Citi's Case 1 Projections DCF analysis and on the low end of the range implied by the Case 2A Projections.  Additionally, the bid was well below the market price for Analogic's stock which, spurred by strong quarterly financial results, was trading above $94.00.  [Id. ¶ 73].  The Board therefore asked Citi for examples of previous transactions where a company was acquired at a price below the price at which its stock was trading and also requested that its counsel consider the implications for board members' fiduciary duties under the circumstances.  [Id. ¶ 74].

Two weeks later, on March 22, 2018, Citi presented a revised DCF analysis to the Board and Analogic's senior management that used a more pessimistic set of projections and applied a 25 percent reduction in annual revenue growth and in non-GAAP EBITDA margin expansion (the "Case 2B Projections").  [Id. ¶ 75].  This DCF analysis implied a value of $74.40 to $94.15, making the Altaris offer appear relatively attractive.  [Id. ¶ 76].  The Committee responded by instructing Citi to use the Case 2B Projections for the purpose of preparing an opinion on the financial fairness of the merger.  [Id. ¶ 77].

On March 27, 2018, the bidder that had previously submitted an offer to acquire Analogic for $85.00 per share based on an above-market valuation of that bidder's stock, submitted a new offer again at $85.00 per share, consisting of 30 percent cash and 70 percent stock based on the spot price of the bidder's stock.  [Id. ¶ 78].  The Board determined, however, that the bidder was not a strategic fit and that it preferred the proposed merger with Altaris at $84.00 per share in cash.  [Id. ¶¶ 79–80].  On April 10, 2018, Citi delivered an opinion that $84.00 per share was fair from a

financial point of view and the Board unanimously voted to approve the merger.  [Id. ¶ 81].  On

that day, Analogic's stock closed at $96.05 per share.  [Id. ¶ 82].

On May 16, 2018, Analogic filed and disseminated the proxy soliciting stockholders'

approval of the merger.  [Id. ¶ 82].  The proxy was supplemented on June 12, 2018 in advance of

a June 22, 2018 vote.  [Id. ¶¶ 83, 99].  The proxy recommended that shareholders vote in favor of

the merger and stated that the merger was "in the best interests of the Company and its

shareholders" and that $84.00 per share was "more favorable to the Company shareholders" than

all other alternatives, including remaining as a standalone company.  [Id. ¶ 84].  The Proxy stated

that this opinion was based on several factors, including:

> The Company's Past Financial and Operating Performance.  Since fiscal 2013, the
> Company has experienced a period of inconsistent performance, characterized by
> flat to declining revenues and earnings.  Over the period from fiscal 2013 through
> fiscal 2017, the Company's revenues have declined at a compound annual rate of
> approximately -3%.  The Board also considered the past performance of
> representative peer companies and the history of third-party analysts making
> significant negative adjustments to the Company's outlook in each year over this
> period.
>
> . . .
>
> The Board considered that these factors raised significant concerns regarding the
> achievability of the Company's financial operating plan, noting in particular that,
> when compared to the Company's four previous operating plans, the Company's
> actual performance has been significantly less favorable than the performance
> projected.  This raised significant doubts that the approximately -3% compound
> annual rate of revenue decline over the past four years could be reversed into the
> 7.8%, 5.3% and 4.0% compound annual growth rate of the revenues reflected in
> Case 1, Case 2A and Case 2B, respectively, over the projected periods of fiscal
> 2018 to 2022.  Even if achieved, the revenues reflected in the first two years of each
> of Case 1, Case 2A and Case 2B would be at the lowest levels recorded by the
> Company since 2014, in the case of Case 1, and since 2011, in the case of Case 2A
> and Case 2B.

[Id. ¶¶ 85–86].  The proxy also stated that Defendants instructed Citi, for the purpose of their

financial analysis, to assume the Case 2B Projections were the best projections for valuing the

Company's stock in comparison.  [Id. ¶ 88].  Specifically, the proxy indicated that the projections

reflected "the best currently available estimates and judgments of the management of Analogic as to the future financial performance of Analogic" and that "Case 2B represented the most likely standalone financial forecast for the Company's business." [Id.]. The proxy advised shareholders that the Committee had concluded that the Case 2B Projections were the best because:

> The Committee expressed its view that neither Case 1 nor Case 2A adequately reflected the risks associated with the achievability of management's operating plan generally, including long-term macroeconomic trends in the maturing medical imaging market, increasing global competition from larger and better capitalized competitors, increasing industry consolidation and the Company's ability to develop new market channels for its products, as well as its view that certain bidders appeared to share this view and noted that the sensitivity analysis illustrated that all three proposals reflected appropriate valuations on a risk adjusted basis.

> In assessing the validity of these risk adjustments [i.e., the 25% haircut from the Case 2A projections to the Case 2B projections], the Committee considered the Company's past performance, the performance of representative peer companies and the history of third-party analysts' adjustments to the Company's outlook. The Committee concluded that the risk adjustments in Case 2B were appropriate and consistent with the Committee's expectations for the business and instructed Citi to consider Case 2B as the best representation of the Company's future prospects.

[Id. ¶ 89].

Although the Board expressed the view that the Case 2B Projections represented the best standalone financial forecast for the Company's business, the 215-page proxy disclosed all three financial projections—Case 1, Case 2A, and Case 2B—and included an extensive description of the bidding process. See [ECF No. 48-1 at 64–70]. The proxy disclosed the timing of the development of the Case 2B Projections, making it clear that the DCF analysis based upon those projections was completed in late March, well after Altaris submitted its $84.00 per share offer. [Id. at 52–54]. The proxy also contained cautionary statements. For example, it explained that "[r]eaders should not place undue reliance on these forward looking statements," and "[t]he estimates contained in Citi's analyses and the valuation ranges resulting from any particular analysis are not necessarily indicative of actual values or predictive of future results or values,

which may be significantly more or less favorable than those suggested by its analyses." [Id. at 32, 63].

At a June 21, 2018 meeting, the merger was approved by 97.66 percent of the votes cast. [ECF No. 48-8 at 6]. The votes in favor accounted for 79.44 percent of outstanding shares, and the transaction closed the following day. See [id.].

Buttny argues that forecast statements in the Proxy, and Defendants' endorsement thereof, were false and misleading in three respects. First, he claims that the proxy falsely stated that the Case 2B Projections more accurately represented the Company's plans and expectations at the time of the Merger than the Case 1 Projections. [Id. ¶¶ 88–89; ECF No. 54 at 17]. Second, the proxy allegedly stated a false rationale for the reduction to the Company's financial projections, which Buttny argues were lowered to support Altaris's claim. [Am. Compl. ¶¶ 88–89, 96; ECF No. 54 at 18–19]. Third, he argues that the proxy buttressed Defendants' claim that $84.00 per share was superior to the Company's standalone plan with false assertions, including the proxy's insinuation that management had a history of giving overly optimistic guidance, that third-party analysts making negative adjustments to management's financial expectations, and considering that only two bidders, neither of which was Altaris, were concerned about its CT Initiative. [Am. Compl. ¶¶ 90–94; ECF No. 54 at 18].

Buttny's general theme is that the Case 2B Projections were manufactured only after it became apparent that the Board and the Committee needed to make an offer of $84.00 per share look attractive because the Board was under pressure to sell. [Am. Compl. ¶ 96]. He claims that Citi's comparable company analysis, which implied a value of $85.00 to $105.00 per share; the price at which Analogic's stock was trading; the price targets set by one equity analysts for

Analogic; and, economic trends for the relevant product markets all support his argument that $84.00 per share was too low.  [Id. ¶ 98].

## II.      PROCEDURAL HISTORY

This action was initiated by a complaint filed by Jeanette Carr on June 21, 2018.  [ECF No. 1].  On July 24, 2018, a similar complaint was filed in this district by Russ Burcaw.  See Compl., Russ Burcaw v. Analogic Corp. et al., No. 18-cv-11557-ADB (D. Mass. July 24, 2018).   On October 10, 2018, the two actions were consolidated, and Buttny was appointed as lead plaintiff in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA") upon the Court's determination that he was the "most adequate plaintiff."  See [ECF No. 42]; 15 U.S.C. § 78u-4.

On November 14, 2018, Buttny filed the Amended Complaint.  [Am. Compl.]   On December 17, 2018, the Individual Defendants and Analogic timely filed their respective motions to dismiss, [ECF Nos. 46, 49], and on January 18, 2019, Buttny filed an omnibus opposition to the motions to dismiss, [ECF No. 54].  The Individual Defendants and Analogic filed reply briefs on February 8, 2019.  [ECF Nos. 55, 56].

## III.     STANDARD OF REVIEW

To evaluate a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor."  A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (quoting Santiago v. P.R., 655 F.3d 61, 72 (1st Cir. 2011)).  The complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief," id. (quoting Fed. R. Civ. P. 8(a)(2)), and should "contain 'enough facts to state a claim to relief that is plausible on its face,'" id. (quoting Bell Atl. Corp. v. Twombly,

550 U.S. 544, 570 (2007)).  "To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability."  Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Id. at 44 (quoting Iqbal, 556 U.S. at 679).  "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."  Hernandez-Cuevas v. Taylor, 723 F.3d 91, 103 (1st Cir. 2013) (quoting Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 14 (1st Cir. 2011)).  "The plausibility standard invites a two-step pavane."  Maddox, 732 F.3d at 80.  First, the Court "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)."  Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)).  Secondly, the Court "must determine whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'"  Id. (quoting Morales-Cruz, 676 F.3d at 224).

## IV.   DISCUSSION

Section 14(a) of the Exchange Act and Rule 14a promulgated thereunder prohibit solicitation by means of a proxy statement containing "any statement which, at the time and in the light of the circumstances under which it is made . . . omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9(a).  Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable" for a securities fraud violation.  15 U.S.C. § 78t(a).  "A section 20(a) claim is dependent upon establishing an 'independent violation of the securities laws.'"  Winters v. Stemberg, 529 F. Supp. 2d 237, 247 (D. Mass. 2008) (quoting In re Focus Enhancements, Inc. Sec.

Litig., 309 F. Supp. 2d 134, 157 (D. Mass. 2001)).  If the Amended Complaint fails to allege a

violation of Section 14(a), it likewise fails to allege a violation of Section 20(a).

To prevail on a claim under Section 14(a), a plaintiff must show: (1) the proxy statement

contained a material misstatement or omission, that (2) caused plaintiff's injury, and (3) that the

proxy solicitation was an essential link in the accomplishment of the transaction.  Mills v. Elec.

Auto-Lite Co., 396 U.S. 375, 384 (1970).  "An omitted fact is material if there is a substantial

likelihood that a reasonable shareholder would consider it important in deciding how to vote."

TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).  The materiality standard

"[contemplates] a showing of a substantial likelihood that, under all the circumstances, the omitted

fact would have assumed actual significance in the deliberations of the reasonable shareholder."

Id.

In some circumstances, statements of opinion may be actionable under Section 14(a).  See

Va. Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1095–96 (1991).  The stated opinion must,

however, "not only be subjectively false—the speaker did not believe it—but also objectively false

as well—that is, there existed provable facts that conflicted with or contradicted the opinion."  In

re Credit Suisse First Bos. Corp., No. 02-cv-12056, 2005 WL 852455, at *5 (D. Mass. Mar. 31,

2005).

Plaintiffs are also required to plead their claims in accordance with the PSLRA.  The

PSLRA provides "safe harbor" provisions that "sharply limit liability of companies and their

management for certain 'forward-looking statements,' . . . when such statements are accompanied

by appropriate cautionary language."  In re Smith & Wesson Holding Corp. Sec. Litig., 669 F.3d

68, 71 n.3 (1st Cir. 2012); see 15 U.S.C. § 78u-5.  "A forward-looking statement is what it sounds

like—a prediction, projection, or plan." Carvelli v. Ocwen Fin. Corp., 934 F.3d 1307, 1324 (11th Cir. 2019).

The PSLRA's safe harbor provisions effectively codify the "bespeaks caution doctrine." Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 772 (1st Cir. 2011). That "doctrine 'is essentially shorthand for the well-established principle that a statement or omission must be considered in context.'" Shaw v. Dig. Equip. Corp., 82 F.3d 1194, 1213 (1st Cir. 1996) (quoting In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 364 (3d Cir. 1993)). It "embodies the principle that when statements of 'soft' information such as forecasts, estimates, opinions, or projections are accompanied by cautionary disclosures that adequately warn of the possibility that actual results or events may turn out differently, the 'soft' statements may not be materially misleading under the securities laws." Id.

> According to Buttny,
>
> [t]he Proxy contained materially false and misleading statements concerning the reasons for making downward revisions to [Analogic's] financial projections. . . . [T]hese statements posited reasons for making these downward adjustments that were contradicted by contemporaneous objective facts. These statements also cast doubt on the achievability of the previous higher versions of these projections, when no such doubts existed.

[Am. Compl. ¶ 14]. Finally, quoting the proxy in his Amended Complaint, Buttny argues that the proxy misled shareholders in stating that, "[a]fter reviewing Case 2B and discussing it with management, the Board advised Citi that, in its view, Case 2B represented the most likely standalone financial forecast for the Company's business." [Id. ¶ 88].

> Buttny claims that,
>
> the Proxy was false and misleading in three related ways. First, the Proxy falsely stated that the Case 2B projections more accurately represented [Analogic's] plans and expectations at the time of the Merger than the Case 1 projections. Second, the Proxy falsity [sic] stated the reasons for the reductive charges to the Company's financial projections. Third, the Proxy used the aforementioned statements to

buttress defendants' false claim that the $84.00 per share offer was superior to the value estimated by the Company's standalone plan.

[ECF No. 54 at 17–18].

Defendants assert that the Amended Complaint should be dismissed because the statements Buttny relies on: (1) are not actionable under the safe harbor provisions of the PLSRA and the bespeaks caution doctrine; (2) have not been plausibly alleged to be both objectively and subjectively false; and (3) were not misleading.  [ECF No. 47 at 15–25; ECF No. 50 at 15–24].

## A.   Defendants' statements were protected by the PSLRA safe harbor and bespeaks caution doctrine.

Defendants argue that "[t]he challenged explanation as to why the Board believed Case 2B was the most reliable projection is . . . forward looking" and falls within the PSLRA's safe harbor provisions, which, as noted <u>supra</u>, is essentially a codification of the bespeaks caution doctrine. [ECF No. 47 at 16]; <u>see also</u> [ECF No. 50 at 15–17 (similar argument)].  The Court largely agrees.

The PLSRA's safe harbor provision provides that a person "shall not be liable with respect to any forward-looking statement . . . [that is] identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially."  15 U.S.C. § 78u-5(c).  "Forward-looking statements," as defined in the PSLRA, include "projection[s] of revenues, income . . . , earnings . . . per share, capital expenditures, dividends, capital structure, or other financial items," "plans and objectives of management for future operations," "a statement of future economic performance," or "any statement of the assumptions underlying or relating to any" of those statements.  15 U.S.C. § 78u-5(i).

"The safe harbor provision does not protect companies and their officials from suit when they 'make a materially false or misleading statement about *current or past facts*, and combine

that statement with a forward-looking statement.'" <u>Hialeah Emps.' Ret. Sys. v. FEI Co.</u>, 289 F.

Supp. 3d 1162, 1172 (D. Or. 2018) (quoting <u>In re Quality Sys., Inc. Sec. Litig.</u>, 865 F.3d 1130,

1142 (9th Cir. 2017)).  The safe harbor applies "only to allegations of falsehood as to the forward-

looking aspects of [such a] statement." <u>In re Stone & Webster, Inc. Sec. Litig.</u>, 414 F.3d 187, 213

(1st Cir. 2005) (citing <u>Shaw v. Digital Equip. Corp.</u>, 82 F.3d 1194, 1213 (1st Cir.1996)).  As the

First Circuit explained in <u>In re Stone & Webster, Inc., Securities Litigation</u>, 414 F.3d 187 (1st Cir.

2005), a mixed statement of fact and financial projection, such as the assertion that a company

"has on hand . . . sufficient sources of funds to meet its anticipated needs," does not fall within the

safe harbor provisions of the PSLRA where a plaintiff asserts that the company was in fact

suffering from "an extreme liquidity crunch" at the time of the statement.  <u>Id.</u> at 212–13.

"Virtually every statement about a future event could be said to imply a statement of

present belief.  Yet examining an alleged present belief apart from the forward-looking aspects of

the statement requires an inquiry into the state of mind of the defendant—something that the first

prong of the safe harbor provision is written to ignore." <u>Grobler v. Neovasc Inc.</u>, 16-cv-11038,

2016 WL 6897760, at *5 (D. Mass. Nov. 22, 2016).  "To take the view that an expression of

'present belief' in a forward-looking statement is a 'present fact'—and therefore not itself a

forward-looking statement—would work an end-run around the PSLRA's safe harbor provision."

<u>FEI</u>, 289 F. Supp. 3d at 1173.

Applying these principles to the statements at issue here, the Court finds that Analogic's

assertion that the Case 2B Projections were "the best currently available estimates and judgments

of the management of Analogic as to the future financial performance of Analogic" was a forward-

looking statement that falls within the PSLRA safe harbor and bespeaks caution doctrine because

of the cautionary language included in the proxy.  <u>See</u> <u>Golub v. Gigamon Inc.</u>, 372 F. Supp. 3d

1033, 1046–48 (N.D. Cal. 2019) (holding that statements about the board's decision to use one set of financial projections rather than another in connection with determination that acquisition price was fair were forward-looking); FEI, 289 F. Supp. 3d at 1172 ("The Board's statement in the Proxy that 'the Higher Projections were significantly less likely than the Lower Projections to reflect a reasonable estimate of the future performance of [the company] on a standalone basis' . . . is a forward-looking statement . . . .").

The projections were identified as forward-looking and included sufficient language to make that evident and to adequately caution shareholders. See, e.g., [ECF No. 48-1 at 32 ("Readers should not place undue reliance on these forward looking statements.  The Company's actual results may differ materially from such forward-looking statements as a result of numerous factors, some of which the Company may not be able to predict and may not be within the Company's control.")].  Compare OFI Asset Mgmt. v. Cooper Tire & Rubber, 834 F.3d 481, 501 (3d Cir. 2016) (finding the language "[y]ou should not regard . . . the projections to be necessarily predictive of actual future events, and you should not rely on the projections as such" to be sufficiently cautionary), with [ECF No. 48-1 at 63 ("The estimates contained in Citi's analyses . . . are not necessarily indicative of actual values or predictive of future results . . . which may be significantly more or less favorable than those suggested by its analyses . . . . Accordingly, the estimates . . . are inherently subject to substantial uncertainty.")].

In response to these quotations from the proxy, Buttny argues that the Court may not take judicial notice of the truth of the proxy's contents.  [ECF No. 54 at 27].  To clarify, the Court does not take judicial notice of the truth of the proxy.  But, Buttny himself quoted the proxy in his initial complaint, without citation and without attaching it.  [Am. Compl. ¶¶ 84–89].  Buttny cannot have it both ways, requesting that the Court consider his representations of the proxy at this stage of the

pleading, but not consider the actual language contained within the proxy itself.  In fact, many of the factual allegations concerning the alleged false or misleading representations concern statements in the proxy.  See [Id. ¶¶ 83–90].  "In deciding a motion to dismiss a securities action, a court may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment."  Shaw, 82 F.3d at 1220 (1st Cir. 1996); see also United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003) (explaining that, in reviewing a motion to dismiss, the court may consider the complaint, matters of judicial notice, and documents incorporated by reference in the complaint).  In evaluating whether Defendants' representations were misleading, the Court must evaluate the statements within the proxy independently.

**B.     Buttny has not sufficiently alleged that the statements were both objectively and subjectively false.**

In the alternative, even if the PSLRA safe harbor or the bespeaks caution doctrine did not apply to statements that are forward-looking, the challenged statements were all statements of opinion.  Interpretations of company data "constitute non-actionable expressions of opinion," unless plaintiffs can demonstrate that "(1) the company's opinions were both objectively and subjectively false, *i.e.*, that the person holding the opinion did not subjectively believe in it, (2) self-embedded facts within the opinion are untrue, or (3) 'material facts about the [opinion holder's] inquiry into or knowledge concerning a statement of opinion' were omitted."  Corban v. Sarepta, No. 14-cv-10201, 2015 WL 1505693, at *6 (quoting Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. 1318, 1329 (2015)) (alterations in original).

Plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . all facts on which that belief is made," 15 U.S.C. § 78u-

4(b)(1)(B), and "state with particularity facts giving rise to a strong inference that the defendant

acted with the required statement of mind," Id. § 78u-4b(2)(A).

Buttny does not allege that any material facts were omitted, instead resting his claim on

allegations that the opinions were both objectively false, because the statements to shareholders

were untrue, and subjectively false, because Defendants did not actually believe them.

1.      Buttny has failed to plead that the statements were objectively false.

In order to demonstrate that the statements were objectively false, Buttny must plead that

the opinion is "seriously undermined by undisclosed or unreasonable assumptions or . . . does not

follow generally accepted accounting principles." FEI, 289 F. Supp. 3d at 1175.

Buttny has failed to plead that the proxy forecasts, which incorporated Analogic's past

performance, are objectively false.   Buttny's statements that "blaming [Analogic's] past

performance was a sham" and that the "Board knew that [Analogic's] past performance was not

an indicator of future expectations," are insufficient.   [Am. Compl. ¶¶ 85, 91].   The proxy

explained that the lower estimate was based on "long-term macroeconomic trends in the maturing

medical imaging market," "increasing global competition from larger and better capitalized

competitors," "increasing industry consolidation," and Analogic's "ability to develop new market

channels for its products." [ECF No. 48-1 at 51].   Even Case 2B, which Buttny argues purposefully

undervalued Analogic, still forecasted annual growth, despite the previous years' revenue declines.

[Id. at 70].   Based on Analogic's history of disappointing revenue, it was reasonable to request

projections that would take those factors into account.

Further, the Amended Complaint does not allege that these explanatory statements were

objectively false.  Rather, Buttny takes issue with how Defendants chose to respond to the financial

forecasts, namely, by trusting and endorsing them.  Buttny asks the Court to find that the reason

given for Case 2B's lower projection, Analogic's previous underperformance, was misleading because Defendants had elsewhere said they expected a performance turnaround.  [Am. Compl. ¶¶ 91–92.]   On the one hand, Buttny asks this Court to consider the fact that Analogic's management had "identified the problem and assured stockholders that the Company was implementing a strategy (a restructuring process) that would lead to financial recovery beginning in 2018," [ECF No. 54 at 11], but on the other hand he requests that the Court discredit Defendants' other forward-looking statements to the effect that the Company would not experience the revenue growth that some forecasts anticipated.  Buttny has not, however, pled any facts that would demonstrate that the Case 2B projections were not actually the most reliable.  Buttny has given no reason why the Court should selectively credit and discredit Defendants' different forward-looking statements.  Though Buttny makes much of the fact that Analogic appeared to be on track to rebound from a disappointing few years, this supports the inference that the more modest projections were more accurate.  FEI, 289 F. Supp. at 1176 ("Plaintiff notes that [the defendant] had rebounded from 'a temporary downturn,' which supports an inference that public statements over a period of time . . . may have been most consistent with the more modest projections.").

Buttny also argues that the Defendants did not consider an offer of $85.00 per share from one bidder because that bidder "was a strategic buyer, unlikely to keep management on like a financial buyer like Altaris."  [Am. Compl. ¶ 78].  Yet, this offer was also 30% cash and 70% stock, as compared to Altaris' cash offer.  [Id.].  Buttny has failed to plead any facts that would indicate any malfeasance on the part of Defendants in selecting the cash offer.  In fact, though 38 potential buyers originally entered into non-disclosure agreements as part of the strategic review

process, only five parties eventually made proposals.  [ECF 48-1 at 58].  Altaris was the only party to make an all-cash offer.  [Id.].  As the proxy explained to shareholders, the cash proposal

> provide[d] immediate liquidity and certainty of value to the Company's shareholders.  The receipt of cash also eliminate[d] exposure to the risk of continued execution of the Company's business on a stand-alone basis . . . including the risks associated with the negative trends and competitive pressures in the Company's markets, the historic inability of the Company to address these challenges and the Board's concerns regarding the achievability of the Company's forecasts.

[Id.].

Buttny attempts to save his claim by relying on In re Hot Topic, Inc. Sec. Lit., No. 13-cv-02939, 2014 WL 7499375 (C.D. Cal. May 2, 2014).  In that case, after a party expressed interest in purchasing the defendant company, the defendants realized that the previous projections "would be problematic in any change-of-control situation."  2014 WL 7499375 at *2.  The defendants provided a revised set of projections which assumed a slower build out of new stores, despite defendants' statements that they were prioritizing increasing the number of stores.  Id.  In general, the proxy statement contradicted every public statement that the defendants had made in the years before the merger.  Id.  As evidence, the plaintiff provided data for two years where Hot Topic met or exceeded its own projections in each quarter.  Id. at *6.  Further, the proxy failed to disclose the methodology and rationale used in making the downward revisions in the post-offer projection.  Id. at *8.

Unlike in Hot Topic, Defendants in this case were explicit in describing the Company's previous failures in meeting projections.  The proxy noted that the Board had "concerns regarding the achievability of the Company's financial operating plan, noting in particular that, when compared to the Company's four previous operating plans, the Company's actual performance ha[d] been significantly less than favorable than the performance projected."  See [Am. Compl.

¶ 86].  Buttny relies on only two quarters selected from the years before the merger to demonstrate that Analogic had actually met projections.  Buttny selects one quarter ending in June for each of the two years before the merger, but does not address the Company's actual results for the fiscal years.  The representative value of those two quarters is suspect, as, according to the press releases referenced in the Amended Complaint, the Company was explicitly referencing its disappointing revenues and reassuring stockholders that it hoped to experience a turnaround.  [Id. ¶¶ 41, 45]. Finally, the proxy outlined the methodology used by Citi in creating Cases 1, 2A, and 2B.  [Id. ¶¶ 88–89; ECF No. 48-1 at 68–70].  Buttny argues that this reasoning was, itself, a misrepresentation, but he fails to provide any basis to explain why the Court should credit some statements from management, such as their "middle of the road guidance," but discredit the statements provided in this case, save for the timing of the projections in relation to the offers.  See [Am. Compl. ¶ 93]. This is discussed in more detail below.

> 2.  Buttny has likewise failed to demonstrate that the statements were subjectively false.

Buttny has likewise failed to plead that the statements were subjectively false, in other words, that Defendants did not actually subjectively believe the allegedly false statements.  In order to allege that Defendants did not believe their own statements to be true, the Amended Complaint must "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A); see FEI, 289 F. Supp. 3d at 1177 ("Plaintiff must allege particular facts demonstrating Defendants' actual disbelief that the Lower Projections more accurately reflected . . . future performances . . . ."); see also Dougherty v. Esperion Therapeutics, Inc., 905 F.3d 971, 979–89 (6th Cir. 2018) (finding that plaintiffs had adequately alleged the scienter requirement where the defendants misleadingly told shareholders that the FDA had said

that a drug would be approved, when defendants had actually been informed by the FDA that it would require pre-approval outcomes trials); Zak v. Chelsea Therapeutics Int'l, Ltd., 780 F.3d 597, 608–09 (4th Cir. 2015) (holding that plaintiff sufficiently alleged a strong inference of scienter when corporate officers knew that a new drug would require more studies before it could be approved, yet told investors that no further studies would be necessary).

In this case, Buttny must allege particular facts that demonstrate that Defendants did not actually believe that the Case 2B lower projections more accurately represented Analogic's future performance. In support of his claim that Defendants did not subjectively believe their statements concerning Analogic's projected value, Buttny makes four assertions: (1) the lower projections were created post-merger offer; (2) Defendants treated the higher projections as accurate before they received an offer; (3) after being presented with the lower projections, post-merger offer, Defendants approved the use of the lower projections; and (4) Defendants had knowledge of the statements in the proxy concerning the projections. [ECF No. 54 at 29]. Buttny therefore asks the Court to infer, from the timing of the higher projection and the post-merger offer lower projection, that the Board subjectively believed the higher projection and discredited the lower projection.

"Although the alleged fact that Defendants knew that more pessimistic projections would be necessary to make the merger appear fair is relevant to the inquiry, this allegation alone is insufficient to give rise to a 'strong inference' of actual disbelief in the likelihood of the Lower Projections." FEI, 289 F. Supp. 3d at 1177. Buttny has cited only one case to support his position that the timing of the projections is sufficient to infer the necessary subjective belief. Hot Topic, a district court decision from another circuit, underscores the Court's point. In that case, the board discussed the first, higher projections "with no mention of their inadequacy or inaccuracy,

suggesting that the Board accepted the suitability of the [higher] projections . . . ."  Hot Topic, 2014 WL 7499375, at *7.

In contrast, according to the Amended Complaint, the Committee held a meeting with all Board members and senior management to discuss both Case 1 and Case 2A contemporaneously. [Am. Compl. ¶¶ 68–69].  At that meeting, when first discussing those projections, the "Committee expressed its view that neither Case 1 nor Case 2A adequately reflected the risks associated with the achievability of management's operating plan generally," due to the market factors discussed above.  [ECF No. 48-1, at 50–51]; supra at pp. 8, 18.  At that meeting, it was agreed that Citi would provide another projection, Case 2B.  Therefore, unlike in Hot Topic, the Board did not at first endorse Case 1 as being the best projection.

This case is more directly analogous to Hialeah Emps.' Ret. Sys. v. FEI Co., 289 F. Supp. 3d 1162 (D. Or. 2018).  In that case, the defendant was in talks with a number of potential buyers. Id. at 1168.  As the buyers made offers, the defendant provided its own higher projections, in order to increase the potential offer value.  Id.  Once there was an offer that the board considered competitive and the other remaining interested buyers backed out, however, the defendant board began calling the higher projections unrealistic.  Id.  According to the plaintiff in that case, the board purposefully began to discredit the higher projections in order to make the offer seem more appealing.  Id. at 1169.  The defendant's financial representative then provided its analysis of the sale, which found the offer fair under the lower projections.  Id.  In distributing the proxy to its shareholders, the defendant explained that, though the proxy contained both sets of projections, the Board had directed its financial adviser to base its analysis off of the lower projection "because those were more likely to reflect the future business performance of [defendant] on a standalone basis . . . ."  Id. (internal quotation marks omitted).  According to the Proxy, the higher projection

"represented an upside case that would be dependent on substantially all individual business units of [defendant] performing at planned levels of performance, which was inconsistent with [defendant's] historical experience . . . ." Id. In FEI Company, the court found that the statements were forward-looking and therefore protected by the safe harbor provision. The direct comparisons to the timeline alleged by Buttny in this case are obvious.

Still, in the alternative, the court in FEI Company found that even if the statements were not forward-looking, the plaintiff had failed to demonstrate objective or subjective falsity. Considering subjective falsity, the court found that the plaintiff had failed to demonstrate that the defendants' interests were not aligned with those of other shareholders. Id. at 1178–79. "Most importantly, [p]laintiff allege[d] that [d]efendants were exclusively on the sale side. Although they were poised to garner substantial bonuses as the result of the merger, the [i]ndividual [d]efendants, unlike those in Hot Topic . . ., would not benefit to the detriment of stockholders were the stock to be sold at less than its fair value." Id.

In this case, the allegations suggest that the Individual Defendants' interests aligned with Analogic's shareholders, as they themselves owned stock in Analogic and it would have been in their interest to maximize the value of that stock. See MAZ Partners LP v. Shear, 204 F. Supp. 3d 365, 375 (D. Mass. 2016) (finding that, when defendant directors owned shares of the company's stock, their interests aligned with public shareholders). Further, Defendants' interests "were fully disclosed . . . in the Proxy statement," which the court also found determinative in FEI. 289 F. Supp. 3d at 1178; see also [ECF No. 48-1 at 60, 74].

### C.     Buttny has failed to allege that the statements were misleading.

Finally, Buttny has failed to allege that the opinions were misleading. In considering whether a statement is misleading, "the federal purpose is served if the statement fully and fairly

sets out such relevant and material facts as would enable a reasonably prudent stockholder to make an intelligent decision as to whether to grant the requested proxy or as to how he should vote on the questions mentioned in the proxy statement." New England Anti-Vivisection Soc'y, Inc. v. United States Surgical Corp., Inc., 889 F.2d 1198, 1202 (1st Cir. 1989) (internal quotation marks omitted). The Court reviews the statements from the perspective of a "reasonable investor." Omnicare, 135 S. Ct. at 1329. A proxy is misleading if it fails to disclose a material fact to shareholders. See, e.g., In re Willis Towers Watson PLC Proxy Litig., No. 18-cv-1874, 2019 WL 4125227, at *6–7 (4th Cir. 2019) (finding that plaintiff had adequately pled that a proxy statement was misleading when it failed to disclose compensation negotiations between CEO and a member of the purchasing party's compensation committee which promised the CEO a six-fold increase in compensation).

In this case, unlike the defendants in Azar v. Blount International, Inc., No. 3:16-cv-483, 2017 WL 1055966 (D. Or. March 20, 2017), on which Buttny relies, Defendants provided its shareholders with every projection and financial forecast, including Cases 1, 2A, and 2B. [ECF No. 48-1 at 68–70]. Reasonable shareholders could therefore appraise the merit of the projections on their own. The proxy also explicitly informed shareholders that "[t]he Company's common stock has traded at levels that exceed the $84.00 per share merger consideration, which represents an approximately 12.5% discount to the closing price per share of the Company's common stock on April 10, 2018, the last trading day prior to announcement of the Company's entry into the merger agreement." [Id. at 59]. Despite these disclosures concerning the reliability of the projections, the interest of Defendants, and the discount on the closing price, 97.66% of shareholders voted in favor of the merger. [ECF No. 48-8 at 6]. Considering Defendants' transparency concerning the accuracy and reliability of the assorted provided projections, the

disclosed interests of the defendants, and Defendants' statement that the final sale price represented a discount as compared to Analogic's closing stock prices, the statements in the proxy were not misleading.

## V.  CONCLUSION

Accordingly, the motions to dismiss are <u>GRANTED</u>, and the Amended Complaint is dismissed with prejudice.  The Court finds that the challenged statements are protected under the PSLRA safe harbor and the bespeaks caution doctrine as forward-looking statements with sufficient cautionary language.  In the alternative, the Court has determined that the statements, as pled, were nonactionable statements of opinion because they were not objectively or subjectively false and were not misleading.

**SO ORDERED.**

September 30, 2019                                      /s/ Allison D. Burroughs
                                                       ALLISON D. BURROUGHS
                                                       U.S. DISTRICT JUDGE